# EXHIBIT A

UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
CONNECTICUT COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES

| | | |
|---|---|---|
| MICHAEL MACDONALD, | : | |
| Complainant, | : | |
| | : | EEOC NO. |
| v. | : | CHRO NO. |
| | : | |
| FLASHPARKING, INC., | : | |
| Respondent. | : | |
| | : | |
| | : | AUGUST 10, 2023 |
| | : | |

_____

## <u>CHARGE AFFIDAVIT OF MICHAEL MACDONALD</u>

l, MICHAEL MACDONALD, duly depose, state, and say:

1.      I am over the age of twenty-one and understand the meaning of an oath. The following statements are based on my personal knowledge and set forth herein under penalty of perjury except where I testify upon information and belief the basis of which is stated.

2.      I object to being sued in Travis County, Texas or the State of Texas.  I never reasonably anticipated being sued in Texas because I have no personal or work contacts in Texas, I have been to Austin, Texas three times (for six days total) in my entire life and <u>not</u> in my capacity as the Director of Product Operations for Flashparking, I do not reside in Texas, and I do not carry on any business in Texas.

## <u>NO CONTACTS WITH TEXAS</u>

3.      I reside in Fairfield, Connecticut.  I have resided in Connecticut since February of 2019.

4.      I am 38 years old and my date of birth is September 30th, 1984.

5.      I have never resided in Texas.

6.      For my entire tenure as an employee of Flashparking, I worked entirely remote from my home in Fairfield, Connecticut.

7.      My role as Director of Product Operations is the subject of this present lawsuit. As the Director of Product Operations, I have never been physically located in the State of Texas and have had very limited contact with the State of Texas since starting this role on August 8, 2022.

8.      I have only been present in Austin, Texas three times in my entire life, from August 9-12, 2021, February 14-16, 2022, and August 3-4, 2022,  **but not** in my capacity as Director of Product Operations for Flashparking.

9.      I have never anticipated or expected to be sued in a lawsuit in Travis County, Texas nor in the State of Texas.

10.     I never worked in Texas, and I have never physically been in the state of Texas in my capacity as Director of Product Operations for Flashparking.

## MY WORK WITH FLASHPARKING RELATED TO FLASHPARKING'S CLAIMS

11.     From September 5, 2019- June 8, 2023, I was an employee of Plaintiff.

12.     My total annual compensation at the time of my job termination was approximately $158,000.00.

13.     In 2019, I began my employment with Flashparking when it was Arrive Mobility. Arrive Mobility is headquartered in Chicago, Illinois and I was its Director of Market Development Field Operations. Arrive Mobility is the parent company for a mobile application named ParkWhiz. People use this app to find, pay for and access parking at thousands of locations across the country. This is a digital solution (mobile app/website).

14.     In January 2021, Arrive Mobility merged with a company called Flashparking out of
        Austin, Texas. The company then acquired 10 additional companies in fairly quick
        succession. This put a digital solution together with a company that built payment machines
        for parking lots, cameras for license plate reading and was on its way to becoming the
        operating system of the smart city.

15.     I continued to do my job well, receiving significant recognition for my work. I took pride
        in my work and looked to advance my career with Flashparking.

16.     In February/March of 2021, I received a raise of ~4.4%.

17.     Shortly thereafter, I brought on an additional two people. I was then approached by the
        COO (Dan Roarty) of the company (former president of Arrive,) about what I wanted my
        next career step to be. I told him I wanted to move closer to the product team and to stop
        traveling so much. I had a young family and I wanted to remain home in Connecticut.  He
        understood my desire not to travel and we agreed that I would start to transition into a new
        role starting in January of the following year (2022.)

18.     In late February of 2022, Dan Roarty sang my praises to all employees on an all hands call
        saying, "if we had 1000 Mike MacDonalds- we'd be unstoppable." I was very successful
        in my role and I enjoyed my work.

19.     In July of 2022, I was in Chicago to meet with Dan Roarty at Arrive Mobility's office in
        Chicago, and we agreed that I'd fulfilled my responsibilities and that it was time for me to
        transfer to the product team fulltime effective in the middle of August.  I was excited for
        the new role and to be a part of advancing Flashparking's market. From August 19 until
        September 2, 2022, I was out of town on vacation and eager to hit the ground running in
        my new role upon my return.

20.    On August 8, 2022, I was given the new title of Director of Product Operations and I was reporting to Matt Perille- SVP of Product for the Digital side of the company, who resides in Chicago, Illinois, and with whom I'd worked with on projects before. I met with Matt to further define my role. I asked him about my title, my job description and an increase in my compensation. Matt responded that he was unsure and that he would look into all of it. After not hearing back, I approached Dan Roarty (COO) and we agreed that the incentive part of my compensation will roll into my base salary (as he quotes- "no one is moving backwards, I'll make sure HR knows to do this.") I did not receive a job description but had increased compensation committed to me for this bigger role.

21.    In this role as Director of Product Operations, I did have access to Flashparking's transaction information. We – me and my team – used this information in our jobs to evaluate the performance of our products and to explore additional opportunities to generate revenue on behalf of the company.

22.    In November of 2022, I met Dan Roarty in Hartford, Connecticut for dinner to revisit my role and to discuss how I maximize my impact. We discussed my pay, title, and overall compensation. He assured me that I would receive incentives to do my new role.

23.    Shortly thereafter, Dan Roarty was replaced as the company's COO by a person named Jeff Hamlin and Dan became the company's Chief Digital Officer.

24.    In early 2023, Jessica Weissburg (Senior Director- Product Design and resident of Michigan,) Mike Wright (Freelance Creative Director and resident of Missouri) and I began to discuss business strategies with Brett Ransby (Senior Product Manager and resident of Wisconsin), Taylor Chapman (Director, Product Management and resident of Arizona,) and Matt Perille (Senior Vice President, Product and resident of Illinois) about

how we could develop and deliver customized solutions to the market, become more efficient with the deployment and analysis of our solutions, as well as grow and evolve Flashparking into an operating system for the smart city. I was still never given a job description as the Director of Product Operations for Flashparking and was actively trying to develop new business strategies for Flashparking. I continued to perform good work and began to build a good working relationship with Matt. All of our industry research and business development ideas were done with the intent to promote Flashparking's business.

25. I continued to hear from my former direct reports that they'd been essentially put on ice. Their new manager, Russ Harris (a resident of Indiana,) was absent and they knew nothing about what was happening to the company, or how they could use their experience to support the company's initiatives. No weekly team calls, no heads up about travel and in general, a chaotic work environment for them.

26. Around the same time, the senior leadership that I'd worked with closely from Arrive Mobility started to get fired. CTO, Hiring HR manager were fired and COO (Dan) was transitioned to the role of Chief Digital Officer. A new CTO (my boss's boss) was hired that has the vision to build "1 team with 1 vision." I was incredibly optimistic that there was a new CTO who seemed to be future-driven and would be on board with learning about potential business development and growth opportunities.

27. In February of 2023, about 10% of the company was let go. The terminations consisted significantly of people from my former company (Arrive).

28. Beginning in February 2023, I started to use ChatGPT (an Artificial Intelligence (AI) powered language, a tool that lets users enter prompts to receive human like response that are created by the AI) to research and develop new ideas and business avenues for

Flashparking. Many other Flashparking employees also used ChatGPT. There was no company policy against using this tool.

29.   Over the next few months, I started to experience obstacles to operate effectively on behalf of the company. While I'd still never received a job description, I saw my role as testing products to optimize them and to uncover new product opportunities for the company. This could be analyzing fee structures to maximize saturation in a parking lot operator's portfolio, identifying the specific locations/cities where we should focus our energies on deploying products, or identifying what cities and locations we were losing money to try to figure out why that was happening. I communicated these ideas to my boss, and he supported my goals. I would document progress on these initiatives and create outlines and presentations for potential products because this company was building the smart city of the future. It was a complete greenfield and when it involves self-driving cars,  landing space for drones, and robots helping with transportation, anything is possible. My job was to be forward-thinking and future -driven. I wanted to be a leader in the company to help this become a reality. I wanted the company to stop losing money. I wanted to dominate our competitors. I was given the opportunity to create new ideas to develop these possibilities.

30.   My role was a cost center at the company. I had to conduct experiments not knowing if they'd be successful or would increase our products conversion by 30%. I would try to learn our data analysis tools to uncover learning that would benefit the company.  As the year progressed, it became harder and harder for me to get approval to conduct these experiments. My boss was data driven so I would work to improve my own skills and with

our data team to build the capabilities in our systems to extrapolate the data he was looking

for. This was a challenge, but I did my best to work through it.

31.    On or about April 2023, I had still not received the pay incentives that had been promised

to me so I scheduled a call with the former COO, now CDO (Dan Roarty,) about this and

he informed me that due to a round of investment we'd received, an audit of all employees'

salaries was conducted and compared to their job descriptions. I'd mentioned the continued

lack of a job description for my role and he mentioned taking my role to the new COO to

highlight my desire to do more for the company and to unblock some initiatives I wanted

to pursue and he promised to get back to me. He knew my intentions were good and that I

was hoping some of these new business strategies would create financial success for the

company.  However, he never followed up.

32.    At this point, I was trying to advance new business strategies to benefit Flashparking. I had

one larger initiative that I really wanted to test for Flashparking- a merchandising kit.

Essentially, it's a tool kit of wayfinding/informational signs and digital payment

opportunities that we could send to parking lots without needing to install them that would

allow us to completely saturate the market with our company's brand and technology. It

would be a step closer to the smart city that I understood the company was interested in

pursuing. It might have been more significant for revenue than the previous QR project I

led, which generated tens of millions of dollars of revenue. I'd receive interest from parking

lot operators to test this kit and then would be blocked internally. I started trying to

streamline parallel efforts within the company related to signage and had made progress

with this.

33.     I uncovered some interesting learnings about ways to increase our revenue and was finally starting to feel like my work goals could be achieved with the support of Flashparking. Knowing that the company's relationship with its supply partners could be fragile and attempting to maximize my own efficiency on behalf of the company, I performed an AI search to brainstorm a collection of loose thoughts that I thought could be refined into a new crown jewel for Flashparking.

34.     On April 17, 2023, for the benefit of Flashparking, I reached out to former Flashparking CTO, Jeff Judge, to brainstorm regarding the industry. I asked him, "Do you have some time later this week when I may be able to bounce a few things off you? They're parking related but not competing with Flash but would have some similar capabilities that you have some experience with."  I consider Jeff a mentor, and I respected his intelligence, so I reached out for a brainstorming discussion.  The discussion never happened.

35.     On April 19, 2023, hoping to develop the ideas I had for potential new business opportunities for Flashparking, I performed an AI search through ChatPGT, related to potential new business strategies for Flashparking. I did this from my home office in Connecticut. In order to do an AI search and get the results you intend, you have to use particular language to 'prompt' the AI program, such as "I'd like to start a company." AI searches, while useful, are still not on the intelligence level of a critical-thinking human. That is why that prompt was used. I did not use this term for me personally, to start a business that would compete with Flashparking. This search was performed with the intent to benefit and grow Flashparking's business and in the course and scope of my employment. I was trying to find new business avenues for Flashparking to explore. Because of the recent layoffs and the failure to pay me the promised incentives, I was

concerned that Flashparking was in financial trouble. I was trying to find a way to turn around the company.

36. Unfortunately, the search did not lead to any new business strategies or avenues to evolve Flashparking's business. In accordance, on May 8, 2023, I forwarded the search to myself again with the note that the search was "Not relevant." See Exh. 1.

37. In fact, the parking transaction information I used in the course and scope of my business, in the AI search, could not be used elsewhere or given to another because that information is real time historical information and outdated the moment there was a major weather event, sporting event, departure of a major employer, or any other million types of changes that effect parking transactions. Put another way – this transaction information would have to ultimately be licensed to be useful in any significant way because it needs to be up to date.

38. Any information that I allegedly transferred was transferred, if at all, for the purposes of performing my job responsibilities to benefit Flashparking. Also, the AI search that I performed to create a new business was done in the course and scope of my employment; and was performed to discover new potential business opportunities for Flashparking and for Flashparking to use within its own business model. It was a search to prompt and generate ideas for Flashparking. In fact, on two occasions, prior to May 2023, I had scheduled meetings with Anthony Broad Crawford, Flashparking CTO, to discuss my role within the organization, including using transaction information, along with the AI search, to advance business strategies for the benefit of Flashparking. This fact was documented in a presentation that was created for the meeting. I also discussed the use of transaction

information to develop new and innovative business strategies with at least two other co-workers in the course and scope of my employment.

39.   The April 19, 2023 google login by mac@arrive.com was me, working from home, logging into the system to do my job from my work computer. Nothing more. I continued to do my work to benefit Flashparking.

40.   On May 24, 2023, I was given notice that my "position was being eliminated" and that my last day of employment would be June 16, 2023. I was offered a severance package and I left my employment on good terms.

41.   I never used Flashparking information – of any kind -  for any other purposes than to benefit Flashparking and in the course and scope of my employment.

42.   On May 24, 2023, nor any time thereafter, was I told to return company property.  I was never told that Plaintiff believed I possessed sensitive company property of any kind.

43.   On June 8, 2023, Flashparking terminated my employment, via email, with the explanation that the Company had "received information that caused it to change its separation plans with him." I was not given any further information.

44.   Flashparking has never told me to return company property.

45.   Flashparking never told me that it had concerns that I had used its information.

46.   Flashparking never asked me why I performed the AI search or how it was used.

47.   Flashparking never asked me the reasons for the google logins.

48.   Flashparking has never told me how it believes I used its information other than to perform my duties at work.

49.   Flashparking never asked me about the value of the parking transaction information I used in my ChatGPT AI search.

50.    Flashparking has never told me how I caused them damages.

51.    I have not started a competing business.

52.    I never signed a non-compete or a non-solicitation agreement with Flashparking.

53.    I never signed an NDA with Flashparking.

54.    I am presently unemployed.

55.    On June 9, 2023, without any discussion or reasonable inquiry in regard to the information it discovered (and used as exhibits to its petition and application for TRO), Plaintiff sued me and wrongfully restricted my liberties.

**VALUATION OF FLASHPARKING'S PARKING TRANSACTION INFORMATION**

56.    I have not taken or misappropriated any information owned by Flashparking.  I do not have any Flashparking property in my possession. I have not shared Flasparking's information with a third person. I only ever used Flashparking's information in the course and scope of my employment and for the benefit of Flashparking.

57.    If an employee were to use Flashparking parking transaction information to compete, my best estimate is that the damages to Flashparking may be well over $75,000.  I say "may be" because it depends how the data is used. See below.

58.    Hence, the allegation in the Complaint that Flashparking would suffer damages less than $75,000 if data was used to compete, is an unreasonable expectation.

59.    The value of Flashparking, Inc. is over $1 billion dollars.  This is a large company that does business in every state and is funding by many different partners and private equity groups.

60.    On information and belief, Flashparking, Inc.'s actual revenue in January 2023 was nearly $8,000,000, producing well over budget and a significant increase from the previous year January 2022. Flashparking's actual revenue in February 2023 was near $9,500,000,

producing well over budget and a significant increase from the previous year February 2022.

61.     On information and belief, Flashparking, Inc. has private equity investors that are working with Flashparking to expand its business. In March 2022, when Flashparking announced its first round of funding of $250,000,000 from investors, additional funds also came in from different investors, so from that alone, Flashparking is valued at over $1 billion.

62.     On information and belief, Flashparking is presently preparing to raise another round of funding, after which, they'll try to go public. I'd put their valuation after another round of funding at $2.5 billion+

63.     This is how immersed Flashparking is in our society and how its information is valued. For example, Flashparking manufactures the ticket and payment machines installed at parking locations. When a car pulls into a parking lot/garage and the driver takes a ticket, that's probably Flashparking's technology. When they pay at a separate machine before getting back to their car, that's probably Flashparking's machine. If there's a valet, that person is probably using Flashparking's technology to check-in and inventory your vehicle. At events, tickets purchased from any ticketing partner like Ticketmaster have the parking add-on powered by Flashparking's technology. With this merger and then the deployment of Flashparking hardware onsite at a parking location, almost 100% of a parking location's transactions can be processed by Flashparking.

Hence, depending on the entity that has this information, it's valuable in different ways:

        1) A direct competitor with this information would be able to identify the specific parking locations where Flash was making most of its money and could refocus its own sales and marketing efforts to put a dent in Flash's revenue in an attempt to capture that

revenue for themselves. If this same direct competitor compared this information side-by-side to the information they had in their own systems about the same location(s), they would be able to identify where they were outperforming Flash, where they were underperforming, the amount they were under/over performing by, the ballpark fiscal performance of Flash, and locations the competitor might not even have on their platform but should prioritize the pursuit of.

2) The 3 most important things in real estate for parking are; location, location, location. The identification of the real estate assets that will generate the highest return is of the most significant interest to any real estate investor. An investor that can successfully analyze trends in the market and identify the states/cities/neighborhoods/streets/specific properties that are undervalued would be in a position to realize a very significant return on their investment. For parking lots/garages, a lot of people would analyze a property in the following way- subtract the operating costs from the revenue, which yields the net operating income. Then divide net operating income by the cap rate. Cap rate is the net operating income divided by the current property value. By having something similar to this Flash performance data for a huge number of parking locations, a person could theoretically analyze a huge number of properties and identify (when compared to their peer locations) the most undervalued assets at that moment in time. By licensing this data and having continued access to it, a person could identify the overall market trends, and identify the specific locations most worthy of investment. Additionally, even deeper analysis could identify pricing strategies for the parking locations in a specific area and optimize parking rates based on historical demand and local competition to maximize revenue.

64.     The company also continues to grow and with their business model, every time they install a piece of hardware, they then process the transactions, which can be a lot and significantly grow their revenue.

65.     There are numerous variables to valuing Flashparking's parking transaction information, and an important piece of really maximizing the value would be continued and licensed access to the information. This would allow for the identification of trends, pricing evaluation, targeting of neighborhoods to try to secure all parking assets, etc.

## MACDONALD'S POTENTIAL CLAIMS AGAINST FLASHPARKING

66.     At all times I was qualified for my job.  I have received numerous awards and was promised various pay incentives for my great work and commitment to the company. When my employment was terminated I was the Director of Product Operations.

67.     During my employment with Flashparking I was discriminated against because I am disabled and was denied reasonable accommodation. I was made promises of pay incentives that were never delivered and that are owed to me. I was retaliated against for participating in an internal investigation of my superior and reporting my co-workers potentially unlawful conduct and safety violations. I suffered intentional infliction of emotional distress. I suffered a hostile work environment and reported sexual harassment of female employees to the senior leadership that was ignored, and other sexually charged comments by co-workers that were inappropriate in the workplace and offensive. I have suffered damages because of Flashparking's unlawful treatment of me.

68.     In late 2019, I began seeing a therapist because of my work stress and anxiety. The stress and hostility at work had caused me anxiety that I had never felt before and at times it became debilitating. I had been seeing a psychiatrist for years for my ADHD, so I had

hoped that this therapist could help me cope and manage my work-related anxiety. Senior leadership knew of my ongoing disabilities of ADHA and anxiety and that I was seeing a therapy. They knew this because I made direct comments to them about talking to my therapist.

69.   In October 2019, I was attended a work lunch where the conversation took a disgusting turn. There were about 8 people at the table and most of them were VP level employees of the company. The conversation somehow got onto a place in NYC called 'The Box.' The Box is a club with a show component. These shows are vulgar to say the least and involve things like a reverse strip show where an already nude performer removes their clothes from a body orifice in front of the audience. Another act has a performer ingest some kind of paint using that same orifice and then with their legs behind their head, cough and paint a canvas positioned a few feet away. This lunch devolved into the most graphic storytelling I'd ever heard. Females at the table were visibly uncomfortable and I complained about this lunch to senior leadership. I'm not aware of any repercussions. This was a hostile act.

70.   In June 2020, I started leading the work on the product that would end up becoming the company's crown jewel- Scan To Pay. From this point until the end of December, 2021, I lead all aspects of this product- production, installation, analysis, strategy, operations, P&L, marketing. I was usually working 100 hours/week+ in parking lots/garages around the country, or at my home office in Connecticut to manage the non-physical labor aspects of the product.

71.   Before the end of the year, my future manager (Matt Perille,) nominated me for a performance award during the company's all hands meeting.

72.   On January 5, 2021, Arrive Mobility 'merged,' with Flash Parking (HQ in Austin.)

73.     Over the course of 2021, I'm on the road for over 200 days. This significantly increases my anxiety and it has a huge impact on my family's lives as well. I'm losing sleep, having trouble focusing, spontaneously crying, physically sick and having panic attacks. I relay this to members of the senior leadership team and am told that while it's widely known that I have a tendency to be very anxious, it's all going to be worth it because the contributions I'm making to the company are so incredible, I'll be justly rewarded both financially and in my career. I continue to request additional resources such as hiring another team member,  to take some of the burden off my shoulders, However, the verbal commitments I receive from senior leadership that help is on the way keep being delayed.

74.     In June/July 2021, Todd Tucker (Chief Legal Counsel and Vice President of Market Development), Dan Roarty (former President of Arrive and now COO of Flash) and a few members of Flash's senior leadership travel to Hartford Connecticut to meet with a partner. I drive from to the city from Philadelphia to deliver a strategic demo that these executives will present to this partner the next day. After meeting many of these executives for the first time, I sit down with Todd Tucker and Dan Roarty to give them an honest analysis of where things stand with this strategic project and to give them an ultimatum that we must hire a direct report for me, to get me off the road or I leave. I told them that my ADHD and anxiety caused by the lack of support is causing me to have unsafe thoughts and my family is breaking apart. I requested to be accommodated for my ADHD and anxiety by hiring another to help and relieve my travel schedule. During this meeting, Todd Tucker identifies a friend, Shawn Murphy as the perfect person to bring in to assist.

75.     In June/July 2021, I hire Shawn Murphy as my first employee to lift some of the travel and install burden. However, I still end up traveling the same amount, if not more, because of

the success this product is having. I later requested more assistance and reminded senior leadership of my accommodation of minimal travel.

76. On July 12, 2023, I arrive in Chicago for a 2 day meeting with Dan Roarty, Todd Tucker, and Shawn Murphy (Manager of Field Operations) to review the successes of our Scan To Pay product and to strategize about the ways which we'll scale it so we can maximize our first mover advantage in the marketplace. This meeting was a great back and forth and laid out a lot of the support Shawn and I both needed to be successful. Dan Roarty and Todd seemed interested in supporting us any way possible and Shawn Murphy and I were presented with a commitment to provide us with equity in the entire company equivalent to 10% if we deploy the Scan To Pay product to 1,500 locations. (We achieved and exceeded this in 2022.) The financial opportunity this presented immediately snapped Shawn and I into a new level of commitment and presented an incredible beacon of hope to my family that all of the hard work, all of the anxiety, all of the pain, frustration, heartbreak, stress, physical illness and lack of support earlier in the year would pay off.

77. After several more trips by Shawn and myself on behalf of the company, we began to inquire about the formalization and documentation of the action items and incentive we were both offered. Responses become intermittent, but when received, include comments about how "I'm letting my anxiety get the best of me" and that the bonuses, promotions and equity heading my way. I felt as if my disability was being mocked.

78. I again travel on the road on behalf of the company and with nothing tangible to show my family, after getting their hopes up after the meeting in Chicago, the mood in the MacDonald house is at an all-time low. I was suffering feelings of hopelessness and my

anxiety was escalating again.  I could not sleep and my health was deteriorating because of it.

79.   September 15, 2021, my life at home reaches a breaking point due to the amount of time I'm spending on the road and my anxiety was palpable. I inform senior leadership of the physical and mental position I'm in and again, request accommodation as well as a change in responsibilities with the company. I requested that I not travel. I'd had bonuses and promotions dangled in front of me for over a year. Good things were imminent, or so I was told. They never came and it was crushing me emotionally given the 100 hour weeks I was enduring over and over again. I felt extreme anxiety about so many things, including the fear I had of losing my job after being furloughed during the peak of covid, and never receiving a performance review or job description was being used against me to continue the work I was doing. The anxiety aggravates my ADHD and I was always depressed and stressed.

80.   On September 20, 2021, I have a call with James Lewis, who was the head of HR for Arrive Mobility and the person that originally brought me into the company. He asks what I need from the company and I reconfirm my desire for the company to respect the previous accommodations I'd mentioned to senior leadership. I specifically mention me getting away from the amount of travel I'd undertaken as well as the importance of me having a job description.

81.   Finally- 2 additional employees are hired to join the team, but I end up still traveling as much as before, but now under the guise of training these people. I'd move closer to being able to not travel as much and then a 'strategic project,' or an issue with a customer that was imperative to our success would appear and pressure would yet again be put on me to

travel. One of these hires ended up being detained by the TSA at the airport after they entered the security screening area and placed their backpack on the X-Ray machine with a handgun in it while traveling to meet me for the first time. "Accommodating" me by hiring more employees, only added to my workload. The accommodation I requested was not to travel, and I was still traveling.

82.   In November 2021, I'm in Nashville for a leadership event and to meet Sharon Schilly for the first time. I learn she lives in Bloomington, Indiana (where I went to college) and I believe we hit it off well (at first). My understanding is that in the new year, I will begin to train Sharon so that she can assume more of the day-to-day management of the company's Scan To Pay product. I would report to her. At the same time, I'd be prepared to move into a role with the product team (I was going to take the role of Director of Product Operations). It is during this event that I told Sharon about my anxiety, ADHD, and requested accommodations not to travel. The accommodation I requested, and I made it very clear, that the amount of my travel must significantly decrease for my own personal mental health reasons as well as that of my family.

83.   On December 13, 2021, I arrive in Chicago for a 2 day meeting to start handing over the Scan To Pay product. This is my first sit down meeting with Sharon Schilly (SVP of Operations). I do 97% of the presentation for this meeting as a brain dump of the work I'd previously done to build Scan To Pay into the highly successful product it is. This involved other products I'd managed for the company and how I'd envisioned the team I'd built supporting the company. During this presentation, I consistently highlight the need to use our company's data to work smarter and also highlight my desire to eventually utilize lidar

camera equipped vehicles to scan locations to collect their physical attributes. I also spent significant time overviewing the safety issues that needed to be considered and addressed.

84.    In January 2022, the new year kicks off with Sharon needing a significant amount of guidance to help her figure out how the products she'll be working with operate and the systems required to activate/manage them.  She did not like that, even though she was my boss, I had a better understanding of her job and how to do it. Sharon began to speak with me in a hostile tone and took every opportunity to belittle me. She also began to purposefully leave me out of meetings and discussions related to Scan To Pay.

85.    In January of 2022, I tested positive for Covid-19 and am bedridden with a severe cough, high fever, headfog, shortness of breath, and sore throat. I inform Sharon of this diagnosis and request time off to recover. She scoffed at the idea of time off and she continued to pressure me to participate in extended meetings. When I told her that I was too sick to continue talking, Sharon berated me and was clearly upset that I needed to rest.

86.    On February 17, 2022, COO (Dan Roarty) gives me an award during the company's all-hands meeting. He tells the company "If we had 1,000 Mike MacDonald's we'd be unstoppable," and that I was a prime example of how my hard work was helping me to create my own next role.

87.    On March 11, 2022, I join a call with Sharon Schilly, Kevin Rose (VP of Manufacturing,) and Bree Schmiling (Lead Project Manager, Digital Solutions) The purpose of this call was to discuss an idea I'd proposed and advocated for about bringing the printing of the physical assets for our Scan To Pay product inhouse. It would provide very significant cost savings for the company. Kevin Rose managed Flash Parking's warehouse in Austin. The idea was to acquire a commercial printing machine and to use a part of the warehouse for this

purpose. I'd documented everything I could think of for Sharon to support this initiative. Sharon started having internal discussions about this project, including with Kevin Rose, and this conversation was my invitation to participate since being the first advocate for it.

88.   I came to find out that Sharon had several other meetings about this project with Kevin Rose, Todd Brocius, Dan Roarty, that I was intentionally not invited. Having not participated in previous conversations, there were certain things that I needed to confirm regarding the equipment, process, and touchpoints across the organization to make sure there would be no negative implications to Scan To Pay, or the company. The Scan To Pay product has some very very unique aspects that are individual to the specific piece and messing it up would be a huge problem.

89.   As I'm asking clarifying questions to Kevin Rose, Sharon Schilly suddenly starts to berate me on the call for asking these questions. She snapped at me, "If you would pay attention, you would know the answer to this already," "Why are we having to repeat ourselves?," "Focus Mac, we're almost at time and  have more to cover." She was using my disability to insult and scold me in front of Kevin and Bree. Her harsh words caused my heart to race and I could feel my anxiety heighten. I had a panic attack and could hardly continue the meeting.

90.   As the subject matter expert for the company's Scan To Pay product, it was my duty to make sure we were doing everything to increase the likelihood of success and having talked to Kevin Rose for now the first time about this, I would not have been able to do that without asking these very specific questions.

91.   The humiliation I felt during this call was extreme. I felt like I was intentionally being made to feel inept by Sharon. I believe she was attempting to discredit me with senior leadership of Flashparking.

92.   On March 15, 2022, Sharon Schilly's Boss, Todd Brosius (President of Ungated and Digital Solutions) scheduled a call with me for March 17, 2022.

93.   On March 16, 2022, the company announces a $250,000,000 investment by a private equity group.

94.   On March 17, 2022, I joined the call with Todd Brosius (President of Ungated and Digital Solutions) and he let me know that he scheduled the call (and was speaking to some other people who reported to Sharon Schilly) to discuss Sharon Schilly's performance as a manager after some complaints about how she harassed and intimidated employees that reported to her. I participated in this investigation of Sharon and gave my honest responses. Knowing the people who reported to her, I wondered if it had something to do with the minority male, the female manager located in the Philippines, myself, or a lesbian female, who had all been vocal about the change in their career trajectories that happened the moment Sharon became their manager. I had firsthand knowledge of issues between Sharon and each of these people but learned during this call that some of these people had requested a new manager because of Sharon Schilly's 'management,' methods. During this call, Todd Brosius tells me that the work I've been doing for the company is incredible.

95.   During this call, I provided Todd Brosius with the following feedback-

   ● My experience is that Sharon Schilly's method of management is to lead by intimidation and veiled threats about performance or termination.

- I know that Sharon Schilly and Meagan McKinnon (Director of Operations) had a contentious relationship and based on my own conversations with Meagan and interactions with Sharon as well as my witnessed interactions of Sharon with others during meetings that Meagan and others were being harassed and intimidated by Sharon.

- Sharon pressured me to continue traveling even though it had been discussed many times at different levels of the company that I'd requested and had been granted accommodation that limited my travel. I've been told that I'm more valuable to the company if I'm not traveling, and this accommodation was going to relieve significant pressures that my family and I were experiencing from the constant traveling I was doing on behalf of the company.

- Sharon's primary concern was the installation and activation of physical assets to parking locations, despite the people managing the installation's reservations about Sharon's nonchalant consideration of safety.

- Sharon had a tendency to misrepresent the work being performed by the installation team to senior executives and the progress of parking locations being activated.

- Sharon has no experience with the work the employees (now reporting to her) in the field will be performing. If she is to manage them, it's imperative that she spends time in the field learning about the process, pitfalls, opportunities, and safety issues associated with this unique work. Without her firsthand understanding and participation in field activity and as the person assuming this responsibility, people's safety and lives are at significant risk.

96.    Todd let me know that he appreciated the feedback and that our conversation is private, but this meeting is public on my work calendar. He's planning on talking with other people

and then will be approaching Sharon and coordinating with other executives directly after these conversations.

97.  From this moment on, my relationship with Sharon undergoes a very significant negative change. She was already hostile and condescending towards me, but now she began taking steps to change the terms and conditions of my employment.

98.  On March 22, 2022,  Sharon Schilly cancels the weekly team call scheduled for March 23, 2022 (Meagan McKinnon and I are both scheduled to be on this call).

99.  In calls with Sharon from this point on, there was always sharp and unwarranted criticism of me in the presence of others. She would always make a point to mention of something I did, didn't do, or in her opinion I dropped the ball on. Whether or not it was true. She would go out of her way to try to knock me down a peg. I mention this observation to Dan Roarty, Todd Tucker, Megan McKinnon, Shawn Murphy, Steve Nicastro, Jason Marovick, Vlad Zakonov, Jose Barbosa, Mike Wright, and others. Sharon also began to pressure me  to travel for work again. When I reminded her that I'm not supposed to be traveling anymore because of my ADHD and anxiety, she would become more aggressive and hostile towards me. Her hostility and public admonishment and ridicule of me and my disability escalated.

100. On April 28, 2022, I was in Vancouver and receive my performance review. I had a call with Sharon and Todd Tucker. It is a 1 hour verbal 'shread fest,' by Sharon Schilly (Todd says very little) that had nothing to do with my previous year of work for the company. I inquire why she's participating in this review because she wasn't my manager during the period covered by the review. Her review centers on my need to be told things multiple times, my scrambling to get things done, my disorganization. I tried to reiterate that I do have ADHD and I tried to correct her groundless accusations, but I was constantly cut off

when protesting her evaluation. She provided me with a 4% raise and says that I'm at the top of my pay band. With inflation where it was at this point, it was actually 5% pay cut.

101.    Previous to this, as recent as February 17, 2022, I had received an excellent performance critique by Dan Rotary when he said "If we had 1,000 Mike MacDonalds we'd be unstoppable." Sharon's performance review of me was false, pretext, and in retaliation for participating in an investigation against her and for requesting an accommodation for my disability.

102.    Included in my review, Sharon stated, "There appears to be a lack of self-awareness even after Mac has been told multiple times. How many times do you have to burn your hand before you stop putting it on the stove?" I perceive this to be a targeted attack at my documented ADHD, which I'd informed Sharon and HR of, and had requested that people accommodate by providing me with 2-3 targeted and documented strategic initiatives at a time to attend to. She was intentionally discriminating against me because of my disability and retaliating against me because I complained and asked for accommodation. I requested this accommodation when I was first hired in September 2019, and again when talking to Sharon for the first time in November 2021.

103.    I'd also previously highlighted and sought to alleviate many of the issues identified in my performance review. As the leader of a highly visible and successful initiative, I understood many opportunities to deliver efficiency. Many of these were documented and resolved before my performance review and others would not be addressed because of the continued and heavy pressure that I continue traveling (despite my requested and granted accommodation.)

104.   I was retaliated against for participating in the internal investigation of Sharon, when Sharon was allowed to participate in my performance review.  This was unusual because she had not been my supervisor until recently. She actively inserted herself in my review process so she could create false narratives about my work performance, giving me a poor performance review in retaliation for participating in the internal investigation on her. This was despite my significant and documented successes from senior leadership. Sharon did this to punish me for participating in an investigation about her harassment and intimidation of the people she interacted with, and safety issues I highlighted.

105.   I'd been told by numerous senior executives that I'd be receiving promotions, bonuses, and pay raises for my development, leadership and execution of the company's most strategic initiative. Sharon's participation and sabotage of my performance review was a single example in a series of acts of retaliation toward me.

106.   On April 29, 2022, while flying back from Vancouver, I texted Todd Tucker to start processing the shocking review I'd just received. He calls it "a shitshow," and tells me Sharon "was way out of line" during my review. I mention my belief that her participation and subsequent review are a result of my earlier conversations with Todd Brocius about Sharon's harassment of me and her direct reports. Todd Tucker reaches out to Sharon's boss, Todd Brocius (President of the ungated division) and Todd Brocius calls me later in the day. He provides me with a 10% total raise and says again that I'm doing awesome work.

107.   On April 30-August 2022, I'm constantly pressured to be on the road, despite requests to not travel as much and statements from leadership about how I'm more valuable to the company documenting as many aspects of Scan To Pay as possible instead of traveling.

Sharon continues to pressure me to travel in order to manage the manual labor associated with installing Scan To Pay. A few trips are to show a new person, Russ Harris (Director of Field Operations), various aspects of installing the physical assets for Scan To Pay and to site survey a handful of locations for a potential future installation project. I immediately noticed Russ's lack of experience and participation in the work we're doing. I reported this to Sharon that his inexperience is dangerous to anyone he might manage. Sharon was incredulous to these comments and insistent upon Russ's increased participation in meetings and installation projects, which were ripe with issues. I began to experience pressure from Sharon regarding Russ's assumption of more responsibilities relating to the management of the field operations team that was handling the installation of physical assets, despite their own concerns about Russ's participation in any project. I did not have confidence in Russ's work and I told this to Sharon.

108. Also, during trips with Russ, I was subjected to numerous inappropriate comments, including those that were sexual in nature about women we drive by while traveling together. These comments were sexually charged, hostile and offensive. Comments about women included: Spontaneous comments about wanting a female we were driving by to sit on his face; sexual comments about women in our proximity and the clothes they were wearing such as he was happy it was hot because it meant that these women "they wouldn't cover their titties up"; and referring to a female coworker as a dyke. I reported these comments and my disgust to senior leadership, but nothing was done about his behaviors. He was not disciplined despite Flashparking's policy of no sexual harassment in the workplace.

109.   It is during these trips that I also learn that Russ was recently Sharon's husband's partner on the police force for the State of Indiana.

110.   Sharon clearly favored Russ. After I reported Russ's conduct and the hostile treatment by Sharon, and her retaliation against me, as well as her failure to accommodate my disability, Sharon continued to retaliate against me.

111.   Sharon then began to be hostile towards my direct report, Shawn Murphy, in an attempt to further retaliate against me. Shawn Murphy (Manager of Field Operations) was my direct report. I had worked with him for several years.

112.   On June 14, 2022, Shawn was selected by Sharon Schilly to receive a company vehicle. This was an opportunity for efficiency I'd previously identified and advocated for. Previously, Shawn would drive his personal vehicle to handle some installation work, but by providing him with a branded company vehicle, the hope was that we could stock it with tools/supplies to allow him to safely and efficiently do his work, all while representing the Flashparking company brand in a big mobile billboard. The vehicle that was delivered to Shawn's house though was so unsafe and in such terrible operating condition that Shawn asked me if it was a message to him from Sharon Schilly that she wanted him (and me) fired. Shawn immediately voiced his concerns to me about the safety of the vehicle and his reservations in driving it because as a person with previous experience repairing vehicles, his analysis was that "it was not a matter of 'if,' but 'when,' something catastrophic would happen," to the vehicle and he would be hurt or killed. The vehicle was not even road worthy. It was unsafe to drive. Shawn told me about his initial test of the vehicle in his driveway where he realized that the vehicle's brakes didn't work and he was unable to stop. I immediately asked Shawn to document the visible issues he saw with the vehicle and to

seek out a qualified repair person to tow the vehicle identify and then quote repairs. When he mentioned that and then documented that there was almost no tread on the tires of the vehicle, I authorized him to have the vehicle towed and for at least that repair to occur. I then sent Sharon an email complaining about the dangerous condition of the vehicle.

113. The initial response from the mechanic after their first check of the vehicle highlighted the immediate need for new tires, new brakes, new rotors, a new windshield, the removal of a rodent nest from the engine, a handful of new sensors/wiring, and other assorted repairs just to make the vehicle safe for the road. The repair/replacement of a locked container/toolbox, that was attached to the pickup truck's bed and allowed for the securing of tools and supplies, also needed to occur before the vehicle's use for business. All of this was in addition to a deep cleaning of the vehicle's interior that was needed to remove an excessive level of filth that was creating a noxious smell.

114. In follow-up conversations about the vehicle, Sharon became hostile when questioned about the process that led her to choose that vehicle to be assigned to Shawn. The vehicle was dangerous for anyone to use let alone in the course of business, or any other function that would require its use.

115. It becomes apparent in conversations with Sharon that her top priority in this matter is the expenditure of money on this vehicle. The safety of Shawn traveling in this vehicle was not brought up by Sharon, but the expenditure for basic reasonable repairs like new tires rouses Sharon's ire.

116. After a handful of conversations about this vehicle and the danger it presented, Sharon started to ignore the issue. This led to the vehicle sitting in storage at the mechanic Shawn had it towed to for over 1 month, where it accumulated daily storage fees.

117. On July 13, 2022, I travel to Chicago and meet with Dan Roarty (COO.) We agree that I've satisfied my requirements and that the time has come for me to change teams. I'm told that there is a bonus for me in the form of stock options in the company that's been slated for review and approval by the company's board. My new role would be Director of Product Operations. I began my new role on August 8, 2022.

118. On August 4, 2023 at 2:30pm Eastern,  Sharon hosts a 15 minute call with my team to announce my departure to the Product Team, and Russ is named by Sharon as my successor. He was less qualified than others to take on my role. Two people on my team had significant experience and were better qualified than him, one of which would have been my preferred replacement to take over my role. The job was never posted and no one ever had a chance to interview before this decision was made. Sharon kept me in the dark about this and placed Russ in this position on her own fruition.

119. On August 8, 2023, my Manager became Matt Perille, (SVP of Digital Product.) He is located in Chicago, IL and reports to the CTO, Anthony Broad-Crawford.

120. Upon working with Matt Perille, I ask for a job description so I can better understand how I'll be evaluated. Without it, I'm floating around without guidance about how to impact the company. I never receive a job description.

121. On September 5-7, 2022, I conducted an experiment in Denver that identified significant opportunities for our company's products. I attempted to present this to Matt numerous times and he continued to ask for specific data about this experiment. I worked with our data team and identified that the ability to extract this data needs to be built.

122. On September 14, 2022, I received a call from Shawn Murphy (who now reported to Russ) who is concerned about the pressure he's receiving from a partner (Diamond Parking,) as

well as Sharon Schilly and Russ Harris to perform work that he feels is not safe to himself, the coworker that's with him, and the general public. I sent him a follow up email documenting our conversation and I discussed the matter with Russ.

123.    On September 19, 2022,  I received a call from Russ Harris and mentioned the safety concerns that Shawn Murphy and Tom Garretson had about the installation method and pressure from Russ to not utilize certain safety equipment (a lift truck instead of a ladder) during the installation. Russ was angry these safety concerns were mentioned to me and he was solely focused on getting information from me about a project.

124.    On September 28, 2022**,** I ask HR for a raise. I am told to contact of the VP of HR- Carol Dunnigan.

125.    On September 30, 2022, I ask Carol for a raise. I highlight the impact I had on the organization. She indicates that she'll look into it and to give her some time.

126.    On October 14, 2022,  I notice that a previously provided incentive component of my pay that's paid on the 15th after the end of a quarter is missing. I message Dan Roarty about this matter.

127.    On October 17, 2022, Carol messages me before our scheduled meeting that Dan Roarty would be following up with me. Nothing happened with my request for a pay raise.

128.    On October 25, 2022, Dan Roarty (COO) travels to Hartford for a client meeting. I grab dinner with him and we cover a lot of different topics. I express my concerns about Russ's ascension to my previous role and inform Dan Roarty about Russ Harris's relationship to Sharon Schilly as Sharon Schilly's husband's partner on the police force in Indiana. I tell Dan Roarty that I suspect nepotism from Sharon is the reason for Russ's promotion and inform Dan Roarty that based on my experience with Russ Harris and watching him

attempt to perform the work necessary, or exhibit the qualifications necessary to then manage the team of people installing our physical assets, that people's safety is at risk with Russ Harris in the role he's now in. I mentioned Russ's lack of concern about employee safety and highlighted the recent instance from Seattle.

129.  During this dinner, I ask for an extra set of hands (Shawn Murphy) to join my team and assist with the direction I'd like to take my new role. I also ask him to add an incentive component 'carrot,' to my compensation.

130.  After dinner on the walk to his hotel, and my car, Dan stops me in front of a parking garage and asks me to envision a franchise kit, giving me specific examples of what he'd like to see. Dan Roarty asks me to deliver something that we can standardize and strategically deploy to parking locations. I was excited about the possible new opportunity for this business development.

131.  Over text that night, Dan Roarty thanked me for the insights and confirms that he'll make an additional resource happen as well as a pay incentive, "a big plate of carrots." Nothing happens.

132.  On October 31, 2022, Matt Perille brings together a group to discuss the company's vision for onsite merchandising. Dan Roarty explains that he's looking for a merchandising kit/franchise kit that we can standardize and send to parking lot operators. This would include wayfinding signs, etc. This became one of my main projects.

133.  Two to three weeks later, Dan is replaced as COO by Jeff Hamlin. Dan Roarty becomes Chief Digital Officer (demotion)

134.  On November 5, 2022,  Shawn Murphy sends me a picture of his bruised and swollen ankle that I later learn is from the use of a ladder for an installation. Shawn informs me that he

felt pressured to continue working. Shawn Murphy later tells me that his doctor identified an injury that should be operated on, but he's reluctant to file a workman's comp claim because of the pressure to continue working from Sharon Schilly and Russ Harris. Shawn Murphy tells me that he feels like his job is at risk from this injury.

135.   On January 15th, 2023, I'm still being paid an incentive component instead of it being added to my base salary.

136.   On February 23, 2023, I have some of my first conversations with ChatGPT about a basket of ideas I'm summing up as "Bingo." I'm most interested in the ability to generate cohesive overviews of my rambling ideas that I can utilize to assist me in presenting the ideas internally. I discuss this during a March 7, 2023 meeting.

137.   On March 7, 2023, Jessica Weissberg (Senior Director Product Design) scheduled a meeting that includes me, Liam Gallagher, Hugh Churchill, Alexandra Vlahakis and Cheng Ding (Business Intelligence Analyst/Engineer). As Jessica writes in the invite,

> "After seeing Hugh's EV fallout journey, I thought it would be extremely helpful for my team to leverage the same format across each payment flow (DTC, STP, Express Pay, Reservations). The only thing I'd like to add to this fallout map is how it translates to revenue. So if we can increase fallout by x%, we can see how that translates to revenue for the business. I'm unfamiliar with how to set things up in Looker, so hoping to get a little more information to help get this going."

138.   In this meeting, Hugh Churchill demonstrates a Looker dashboard he created that allows him to analyze where people exit the checkout process for the company's EV product. Of extreme interest to Jessica and myself is his analysis of engagement and then being able to further analyze upon that metric.

139.   During this meeting, it is discussed how due to mergers and acquisitions, different products/teams have different data capabilities in Looker depending on what was

built/analyzed in each acquired companies systems before coming under the Flash umbrella.

140.    For Jessica and my uses, there is no ability to analyze engagement because that would require the ability to pair a person's transaction and digital behavior to a 'Booking ID,' and that ability does not yet exist.  We end the meeting with an agreement to continue work with Cheng to identify the metrics most important to Jessica and myself, how we can use existing capabilities within Looker to capture that specific data, and then identify the capabilities still needed within Looker to help us analyze that data.

141.    After this meeting- There are various Slack messages between Jessica Weissberg and me where we discuss using Looker for data analysis, our frustrations with the lack of some specific capabilities, and we try to help each other as best we can with data queries we've conducted inside of Looker.

142.    On March 21, 2023, Jessica Weissberg scheduled a meeting with Cheng Ding at my request for March 24, 2023. From the meeting invite- "Hoping to get together for assistance with a handful of data points Jessica and I are interested in tracking…" and "How much revenue is each source generating and losing? How much additional revenue can we bring in?" "For STP, how many signs are being installed on average per location and how much revenue is being generated per sign/capacity?" This   Capacity data is a type of transaction information that is at issue in this lawsuit. The access of this data was part of my regular job functions, and Jessica and her team also had access to this information and used it in the course and scope of their job.

143.    On March 24, 2023, Jessica Weissberg, and I have a meeting with Chang Ding (Business Intelligence Analyst/Engineer) to discuss the above, and how to optimize our targeting of

products and experiences to locations. It is reconfirmed during this meeting that development to include 'Booking ID,' in analysis within Looker is necessary to accomplish a lot of the other data analysis we're interested in, specifically engagement and user flow/ shopping cart abandonment. Jessica and I both submit JIRA development tickets after our meeting with Cheng.

144. On March 24,2023, I submit JIRA ticket (DT-4868) 'Historical and present engagement and conversion by product/beacon at a location' The purpose of this development request is to enable myself and Jessica Weissberg to analyze the impact on engagement, conversion and revenue that changes to the physical environment of a parking location and changes to our digital assets (mobile application/checkout) contribute to engagement, conversion and revenue. As discussed with Matt Perille, Jessica Wiessberg, Mike Wright and others- this will allow us to identify how to not only optimize our product, but to identify the specific locations that we should target and the specific physical assets to deploy onsite and/or the specific digital experience that maximizes the impact to those Key Performance Indicators.

145. During my next 1-on-1 with my manager Matt Perille, I inquired again about my pay incentive that was promised to me over six months prior. He has no answer for me.

146. On April 15, 2023, the pay incentive still hasn't been rolled into my salary and I see that it's not been paid as a lump sum like it had for the past 3+ years. I contacted HR. They tell me there's no record of this happening and I send them the screenshot of Dan's assurances that it'll be taken care of. They reply that it's not going to happen. I expressed my frustration to my boss, Matt Perille, and he brushed it off with the response, "I'll look into it."

147.   On April 17, 2023, our head designer Mike Wright forwards an email about a meeting he was invited to that was going to kick-off a redesign of the Scan To Pay signs our company produces. Since this would be a Product related project, he requests that I get invited to the meeting. Sharon Schilly and her former boss before an acquisition, Kevin Uhlenhacker, reply that they're actually going to reschedule the meeting. They actually don't reschedule the meeting but have the meeting without us where the  work that Mike Wright and I had been doing for signage redesigns is presented.

148.   On or about April 19, 2023, I am working on a project from my boss, Matt Perille, about the performance of Scan To Pay locations, DTC locations (separate product I managed), revenue we're losing or could realize, location performance, potential products, really anything that boosts net revenue. This analysis has me using capacity, revenue and booking data from Looker.

149.   In tandem, I started to revisit the idea of what Bingo actually is. I'm going to start working on a way to pitch a rough idea of Bingo internally and refine it as I get feedback.

150.   On April 27, 2023, I submit my self evaluation for performance reviews. Reviews from our managers are to be completed by the end of June.

151.   On April 27, 2023, I have a meeting with Dan Roarty to talk about what's going on with the change in my compensation. He tells me that our investors are spooked about the economy and ordered a review of everyone's compensation compared to their job description. .  I asked for a copy of that job description, but it was never provided. I was an outlier so my compensation was being cut. This was an adverse employment action.  First, I was not given the pay incentive I was promised and now they were cutting my pay. I express frustration about the lack of support I'm receiving for the project he'd originally

kicked off. He tells me he'll bring it up to Jeff Hamlin and promises to get back with me

early the next week, but he doesn't. He asks for a quick brief about some of the impacts my

project testing have delivered and I provide that information to him on the same-day.

152.   On May 4, 2023, Mike Wright (Lead Designer) scheduled a meeting that included me,

Jessica Weissberg (Director of User Experience,) and the CTO (Anthony Broad-

Crawford.) Mike Wright. Jessica Weissberg and I were looking to recap work done so far

on improving revenue for Scan To Pay, the success of testing for the company's Digital

Ticket Checkout product, and progress on a handful of ideas I'd previously brought to the

company for consideration, had data to justify its continued support, and are now the issue

of this litigation. With Jessica, Mike, and Anthony's participation, I was excited to explore

the future of what we were already working on, and starting to develop, in order to support

the company. I was looking to use this meeting to gain Anthony Broad-Crawford's

guidance and executive sponsorship, but he did not attend that meeting. Flashparking knew

I had performed this AI search and supported my efforts.

153.   On May 5, 2023, Current Flash CTO, Anthony Broad-Crawford hosts an all-hands meeting

with the Product and Engineering teams. During his presentation, he recaps the company's

OKRs (Objectives and Key Results.) They are: Digitize Supply, Build & Deliver

Directable Demand, Enterprise Engagement, Leverage EV Charging, Operate Efficiently.

154.   In his presentation, Anthony Broad-Crawford highlights the importance of creating

efficiencies to the organization. I was excited by this because I believed that I could confide

in Anthony Broad-Crawford about my current frustrations and the opportunities I saw for

my contributions to the organization to expand. The other thing that was inspirational to

me is Anthony Broad-Craford's request that we "put turds on the table," meaning that we

can talk to him about the things that are causing us frustration, making us inefficient, creating turnover, decreasing productivity, and making us less efficient players on the team. I had a lot to discuss with Anthony and I was eager for us to connect in this meeting. I'd brought up my desire to connect with Anthony Broad-Crawford to my manager, Matt Perille, numerous times and he continually let me know he was waiting for the right time for us to connect and discuss projects. Matt's continued delays in scheduling something was frustrating and anxiety inducing.

155.   On May 12, 2023, Mike Wright scheduled another meeting with Anthony Broad-Crawford (CTO). We had created a presentation that specifically called out the importance of using company data for what we were trying to do to support the company. Again, this was in regard to the AI search I performed that is the subject of this litigation. Anthony Broad-Crawford is a tentative to the meeting, and ultimately does not show up. Flashparking knew I had performed this AI search and supported my efforts.

156.   Later this same day, I lead a call with leaders from our EV division and we agree to align all signage processes to make the company more efficient. As Anthony Broad-Crawford had continually said, ' One Team, One Vision.' We're finally starting to achieve this and I find myself in a leadership role making this happen. Matt Perille responds to me that these developments are "promising."

157.   On May 19, 2023, Mike Wright and I have a call with Mike McKeon (Head of Brand at Flash.) Sabrina Zahn (SVP of Marketing) is supposed to attend but is picking up her kids from school. Mike, Mike and I agree to further consolidate the signage process, agree testing and data is important, agree on the importance of what I'm doing for the company, and we're starting to make some serious traction. I'm building broad support from key

stakeholders for an initiative that they themselves identify as imperative to the organization.

158. On May 24, 2023, I joined my weekly one on one with my boss and see Carol Dunnigan (VP of HR) on the call as well. I'm informed that my position is being eliminated. I'm told that I'm still on payroll as an employee until June 16th, at which point I'll be sent a separation agreement. Upon signing this agreement, which includes confirmation that I've returned all company property, I'll receive severance for 2 months. I bring up my concerns that my inquiry about the change to my compensation is involved in being fired, to which Carol waffles in her reply.

159. One week later, Carol emails to let me know that while Dan Roarty says he never committed to doing anything about rolling my incentive into my base salary, she'll increase my severance payments to include a portion of this.

160. On June 8, 2023, I received an email from Carol, terminating my employment immediately.

161. On June 9, 2023, without any investigation or inquiry of me by Flashparking, Flashparking sued me.

162. Since my termination, I've applied for jobs with industry partners of Flashparking. On information and belief, Flashparking has taken steps to blacklist me from this industry. I have talked to a few industry partners about career opportunities that suddenly go silent. I was positioned to receive recognition as one of the "40 under 40 leaders" in the parking industry for my exceptional work, but it did not happen. On information and belief, Flashparking played a hand in making sure I did not receive the accolade.

MICHAEL MACDONALD

August 10, 2023
DATE

NOTARY PUBLIC

**SUSAN M. SEYFRIED**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES AUG. 31, 2023

SWORN TO BEFORE ME THIS THE
10th DAY OF AUGUST 2023.